Good morning, Your Honor. May it please the Court, we are here today on the appeal of Hoschar v. Appalachian Power Company and there are two issues, two challenges to the District Court. The first issue is a jurisdictional issue. My clients, the Hoschars, the plaintiffs filed their case in Mason County Circuit Court in West Virginia. They believe that the case should never have been removed to federal court. There wasn't jurisdiction there. They are domiciled in West Virginia. They allege that Appalachian Power Company's principal place of business is in West Virginia. That's the first issue. No jurisdiction, the case should be remanded to Mason County Circuit Court. The second issue involves a question, a fairly straightforward and simple question as to whether, without more, a publication by NIOSH, the National Institute of Occupational Safety and Health, which has been disseminated by OSHA, the Occupational Safety and Health Administration, on its website under a page intended to provide employers with information necessary to evaluate hazards in the workplace, whether those two facts alone are sufficient to get to a jury on the question as to whether an premises owner under West Virginia law knew or should have known of the information contained in the document. So are all employers required to know of every page on every website of every government entity regardless of what their industry is? I think that all industrial employers are required to know all of the information that has been specifically promulgated by the entity that regulates them, the Occupational Safety and Health Administration, specifically for the purpose of providing them with information that they may not know but need to know. I think absolutely. And I don't even, if you go back through the case law and the history of this, and I'll start with this issue since this appears to be the issue that you're more interested in at the moment. Actually, I'm more interested in jurisdiction. Okay, well, I'm happy to start, that was what I was going to start with. No, please, go ahead and address Judge Stackley's concerns and we can come back to Judge Stackley. I'm interested in it all. If you go back to the history of cases that look at the question as to whether publication alone, finding proof that a document that everybody concedes, or at least for purposes of the summary judgment stage, everybody concedes, would provide sufficient notice to get to a jury. Whether publication of that document is sufficient to put somebody on notice of the information contained in the document, they all start at the other end of the spectrum. The question is whether you're automatically chargeable with it. If you're a plaintiff looking to get into court on the discovery rule in a statute of limitations context, and you say, I didn't discover, I couldn't have known my cause of action until this date, and they come forward, the defendants, and this has happened throughout, for many years, there have been issues, this issue has arisen, the defendants come forward and say, look, this was published. There was this information, and if you read that, you would have noticed that you had a cause of action. The question is not, is there even, is summary judgment on the statute of limitations issue appropriate for the plaintiff? Well, no, there's no reason that the plaintiff should have known that. The question is always, is summary judgment appropriate on the other side? Can we take the fact that a document is published in the public domain as evidence, in and of itself sufficient evidence, just to resolve the issue as a matter of law, that that person knew or should have known, should a reasonably diligent person would have checked the public record. Now we've flipped it on its head. Appalachian Power is regulated by the Occupational Safety and Health Administration. They're a large industrial employer, we all know that, and OSHA put out this document. They put it on their website. If they hadn't put it on their website in the days before the internet, they probably would have sent a bulletin around. They put it on their website, and it says, here is information that you need to know to protect your workers. It didn't get embodied directly into a regulation, but it's information that is out there. OSHA and this is... Okay, so the answer is yes, your answer to my question is yes, if it's information that's out there in the public domain, regardless of whether it's promulgated as a regulation or not, this employer should have been aware of it. I think that the strong version is, I mean, I think there are two ways to do it. First off, I think that yes, if it's in the public domain, and it pertains to the employer's business, and it pertains to the business... Okay, I don't want to take up any more time with that, really. I understand your position, and I do think the jurisdictional point is more important. Okay. In this instance, Appalachian... So I'm turning to the jurisdictional issue then. Appalachian Power Company, we have a case. I took the deposition. Nobody has objected to it. Nobody has said that the information contained in it is not correct or not accurate. The person who was deposed was still an officer at the time. He said that Appalachian Power Company's headquarters is in Charleston, West Virginia. That's what they refer to as their headquarters, Appalachian Power Company. He also referred to something that he referred to as AEP's headquarters in Columbus, Ohio. That's American Electric Power Corporation. American Electric Power Corporation owns Appalachian Power Company. As the owner of Appalachian Power Company, they do lots of things that are probably true in most parent-subsidiary relationships. They have ultimate control. At the end of the day, the owner of a company can veto any action taken by the company's officers. The CEO of the company, of the parent corporation, American Electric Power Company, is also the CEO of all of the subsidiaries. The president and chief operating officer of Appalachian Power Company is stationed in Charleston, West Virginia. In fact, at the time of the deposition, Appalachian Power was undergoing a change, and at that time, there was a post of president of Appalachian Power Company, a man who was currently stationed working for a different AEP entity in Columbus. They moved him to Charleston for the purpose of directing, controlling, and coordinating the operations of Appalachian Power Company. These are distinct entities. One is owned. One has ultimate control. The other one actually operates, directs, operates, and controls the corporation. There's no getting around this type of issue. I think it's... The Charleston office handles the day-to-day operations. Is that what you're saying? They certainly handle the day-to-day operations, but they also handle the year-to-year operations. They get a budget from the parent company. The parent company sets the budget. Sets them, as we said, it's a number. They give us a number, and then we allocate that to the corporations within it. Here's what you have to do to stay under it. Here's what you do. The subsidiary essentially controls their operations. It is day-to-day operations, but it's also year-to-year. They control their... Their business. Their business, but not the ultimate way that the business operates, correct? That's handled out of Columbus. Ultimate control over the business. Appalachian Power Company is in the business of generating power and distributing that power to companies. Neither AEP nor Appalachian Power are really in the business of transmission, or transmission assets are different and they're controlled by a federal consortium, but the distribution of electricity to customers and the generation of power at those power plants that they run. Appalachian Power Company, those are its two businesses. Appalachian Power Company's officers in Charleston direct, control, and coordinate all the functions of those businesses. They have a president. They have a vice president in charge of generating assets. They have a vice president in charge of distribution operations. What they don't control are certain big picture things. That's it. That's not the... The plants are controlled in Charleston. That's a pretty big thing in terms of analyzing where the real nerve center of the company is though, isn't it? Aren't the sorts of responsibilities you're saying that are handled in Charleston the types of things that we found insufficient in Mountain State Carbon? How do you distinguish Mountain State Carbon? The Mountain State Carbon case involved a case of a manufacturing company in the business of manufacturing that had a plant in Wheeling and it had a general manager over that plant stationed in Wheeling who managed the Wheeling plant. Every other, and he was also a vice president, every other officer was in Dearborn, Michigan. There were no, none of the activities that officers generally engage in occurred in Wheeling. The only activity that occurred in was the management of a plant by a plant manager. Appalachian Power Company has lots of plants in West Virginia, Tennessee, Virginia. Those plants are all probably as large as that Wheeling plant. They all have plant managers. None of that is relevant to the jurisdictional analysis. That's the management of a facility that is engaged in a limited aspect of a company's operations. I was a little surprised that you didn't, after the Dempsey affidavit came in, you didn't want to question him about the affidavit. Your Honor, at the time that, and I'll be frank, at the time that this, the motion to remand was briefed and completed at the district court level, the Central West Virginia Energy Corporation v. Mountain State Carbon LLC company case was, had not been decided, and in fact at the district court level it had gone the other way, and our case was an A4CRI case, so I was very confident. I was, I guess we can chalk that up to overconfidence. Stuff happens. And then it got reversed and it goes the other way. It's still an A4CRI case. There's no question that the case that Charleston is Appalachian Power Company's headquarters is in the case that Wheeling, the Severstar Wheeling's headquarters ever was, but that I think is the answer to that. How should courts, or how have courts and how should we treat, weigh, consider a company's public declaration that this is our headquarters? I mean the Supreme Court had a little bit to say about that, but how should we, because I mean that's a big fact in this case, right? I mean I checked the website yesterday and they're still saying it's their headquarters. I think the company's public declaration that West Virginia is the headquarters is relevant. Certainly it gets into things that I didn't focus on in the brief because I was concerned about things that have already been said in the Central West Virginia case, and I didn't want to run afoul in it in any way of it. I think there were some public declarations in that case. Certainly in other cases that have been decided, and I brought one of those cases, most of the cases still following Hertz v. Friend are unpublished cases, so this circuit has decided one of the few published cases. There's a case, Safeco Insurance Company of America, this is an unpublished decision versus, well that's why I didn't cite it, so I won't refer to it. So I'm asking you as an original matter, how should this court? I think it is important. I think that their internal designation, what they say internally is as important as well. I think that those two things, and they both go in favor of Charleston, West Virginia in this instance, are the controlling things, and if you look at the Hertz decision and they say repeatedly, look to the headquarters, look to the headquarters, unless the headquarters is what they call the headquarters, it's hard to know what they would mean by it because then it just becomes a tautology. Well doesn't the Dempsey affidavit express what they say internally, where their headquarters is located, where their CEO, their chief financial officer, their entire board of directors, all of the ultimate decision-making authority is in Columbus? And Mr. Dempsey, even in his statement that we refer to it as our headquarters, he said that was a misnomer because a former president lived there, and he referred to it as an administrative office. So Mr. Dempsey said that it was probably a misnomer in response to a leading question that I objected to. I might have moved to strike that, but again I was overconfident. But he also said repeatedly that we call it the headquarters, and there we do, we manage direct control and coordinated matters such as manpower, the allocation of the budget. These are direct control coordination issues. Well in Mountain State Carbon we said that public interface, even the public interface of saying it's the headquarters and your day-to-day operations was insufficient when you look at all the other factors, that everything was really being done in Michigan. That was the nerve center of the company. And if I can just briefly, and then reserve the rest of my time. In Mountain State Carbon, the president and seven of the eight officers, the president and chief operating officer in addition to the CEO, were located in Dearborn, Michigan. There was just a plant manager was all that they were talking about who was vice president. Here there's a president and chief operating officer. We know that that means that that is the guy who has primary responsibility for this company's operations, for directing control and coordinating them. There's a CEO in Columbus, Ohio who's the CEO of all the entities. He has ultimate control and can veto those actions. This court, I don't think Central West Virginia Energy resolves this issue. This court has to do it, and it's an issue that's going to keep coming up. Thank you. Michael Moore? Mitchell Moore. Thank you, and good afternoon. My name is Dan Mitchell Moore, and I represent the Appalachian Power, who I may refer to as APCO. Basically, you know, it's our position that the basic facts, I guess in answer to your question, Judge, I would say that labels don't matter. What matters are the facts, and that's what the Supreme Court says, the facts of corporate control. In this case, we've got 22 of the 27 officers in Columbus. We've got all nine of the directors. In Charleston, the chief operating officer, he's in charge of the day-to-day operations of the distribution aspect of the business. That's sort of like the retail, you know, customer service, meter reading, you know, fixing down telephone lines, those types of things. But he reports directly to somebody in Columbus. The budget is set for him by APCO's officers in Columbus. I think there's some confusion about that the parent is somehow doing things for the subsidiary. No, I mean, these are all APCO officers who set the budget for APCO, and they do it in Columbus. The chief financial officer is there. The chief accounting officer is there. When you say they set the budget, does that mean anything other than they give them an amount of money they can spend over the next year? Correct. So you're right. No, no, I don't think, you can't answer correct. My question is, does it mean anything more than that? It means that this is your annual budget, and you can, you have this amount of money. My question is, what is the annual budget? Do they say you can spend 13% of your budget on utilities, or do they say, you got $27 million, make it work? It's my understanding that they give them a number, they give them a number, and they say make it work. So the real decision making, it seems to me, takes place in Charleston. I don't know. You don't know. See, that's the problem. No, no. No, here's the problem. Here's the problem. You don't know, and you have the burden of proof, don't you? This case was removed, which means that if the evidence is in equipose on whether the NERV Center is in Charleston or somewhere else, since you have the burden of proof to one jurisdiction, the case goes back, right? When I was saying I don't know what I meant, that was a preface to it. I know what you meant. I was about to disagree with your position, which is, to me, how much money the business is going to spend, that's the key decision. How you allocate $100, $20 here, $15 here, is not as important as the decision, we are going to spend $100. And that's your opinion. That's my position, correct. But there's no affidavit here that says that. It just says we set the budget. Set the budget, correct. And in this deposition... Which is what any parent corporation would do for its many subsidiaries. Parent corporation, holding company, has X number of dollars to distribute. This is what you get. University of Maryland School of Law, like the University of Maryland School of Medicine, goes to the legislature, and the legislature says, here's what we're going to give the Baltimore campus. The evidence here is that, in the deposition and the affidavit, is that APCO's officers, they set the budget, and then they send it to Charleston. You're using the term, set the budget, when what you're really describing is just carving up a pie. Well, no, no, they have the pie, and they give the pie to Charleston, and Charleston can carve it up how they wish. But they're the ones with the power to give the pie. That's the ultimate control. I mean, they're also, if you look, in terms of other financial things, it's the officers in APCO that decide whether to build a new power plant, or whether to build new substations, or new transmission towers. In other words, the answer to Judge Davis' question is, these things are ticking off, the people who make that decision, they're in Columbus, correct? Correct. And they sit down and plan these things as well, right? They just don't write checks. No, they don't just write checks, correct. Well, for certain aspects of the business, for the distribution side of the business in Charleston, they make sort of the day-to-day decisions about, you know, do we need to move employees around, do we need, you know, hire new staff, or things of that nature. But sort of the big-picture decisions are made in Columbus. For the other aspects of the business, like generation and transmission. What does the CEO do? The CEO, you know, what CEOs do, they direct and coordinate and control all aspects of the business. They're the top officer, and they have the final say on all matters relating to the business. You're talking about the CEO in Columbus? The CEO of Appalachian Power Company, correct. And these officers are Appalachian officers? Yeah, they're officers of APCO, yes. I mean, if you read the deposition, basically, you know, Mr. McLaughlin has sort of a manifest of all the officers of the company, and then the deposition is he just goes through and asks what they do. And, you know, 22 of the 27 are in Columbus, including sort of the High Line. Why do you call it your corporate headquarters in West Virginia? I think because it's sort of like the public, it's the publicly visible place. Right? I mean, because Appalachian Power... Because there's a plant there? What? Because there's a plant there? No, because, you know, Appalachian Power serves Virginia, West Virginia, and Tennessee. It doesn't serve anybody in Ohio. And certainly from a business perspective, you want to have a face in the region where you are serving your customers. But the real sort of shot callers are in Columbus. Well, that goes against the whole idea that the theory of diversity of jurisdiction is that we don't want the out-of-state corporations to be subjected to home cooking or any kind of disfavorable thinking. You calculated to make your company a face in West Virginia. You just said that. But doesn't every... I mean... But every... Like in the Hertz case. I mean, certainly like... No, but Hertz was just renting cars. They didn't care. But we're just selling electricity. Oh, sorry. It just so happened that California's more populous. That's why they were renting more cars there. There's no evidence that Hertz was trying to be a Californian. You just admitted that you wanted a face there. You ticked off other states, but West Virginia, we wanted a public face there to show that we're there. But then you want to run away from that face. No, I'm just... I'm saying that Hertz certainly has a public face in California, right? There are tons and tons of Hertz rental car dealerships all across California so that customers can see it. But that's due to population. Because California is the most populous state in the union, right? That they have that many stores? That they have that many dealerships? More people rent cars there, right? Because more people live there. But it's different than a company making a decision to put a face to West Virginia. And you have corporate offices there, correct? Corporate offices... Officers in West Virginia. Four. Four. Correct. So it's not just that you just call it. It's not a mailbox drop. It's not just a website label. It speaks to your corporate offices are there that make decisions. I think the president is pretty high up, don't you think? But in the deposition testimony, he reports to another APCO officer in Columbus. He is not the top dog. Obviously, the CEO is. But when you have a parent, you always have to report to a parent. But they're a separate company. No, but he's not... The record doesn't show that. I mean, the deposition is he reports to an APCO officer in Columbus. He's not reporting to an AEP officer. The majority of the APCO officers are in Columbus? Correct. Yeah, 22 of 27. And the officers of APCO are the same as the officers of OPCO, which is an Ohio power company, and of some of our other utilities. But the Mountain State Carbon case specifically talks about that. There's nothing wrong with that. You can have officers can be officers in both a parent and a subsidiary or in affiliated companies, and they can also share the same location with the parent. There's nothing wrong with that. You don't do anything in terms of operations in Ohio? Well, actually, we run the power plants from there. Right, right. The nerve center, you would say. Right. But, I mean, we actually, there is somebody, you know, there's someone in, you know, where this alleged accident happened, you know, the Sporn plant. There's somebody in West Virginia that flicks the switch, but there's someone in Columbus that tells them to. The generation, right, the production of power, the running of the power plants, that is done out of Columbus. And it's only the distribution that's in West Virginia, is that right? Yeah, right. I mean, it's the meter reading and the customer service and those types of things. The service trucks, the servicemen, those types of things. Hertz uses the language direct, control, and coordinate as sort of the thing that signifies the nerve center. Do you need all three of those things? Direct, control, and coordinate. I guess I think of those words as all sort of being very similar. I mean, the way I read Hertz, and certainly the way I read Mountain State is, you know, where is the high-level officers making the significant corporate decisions? But the language is direct, control, and coordinate. You don't think they all mean the same thing. Direct and control sound very similar to me. What about coordinate? Coordinate's a little different, yeah. And is this case more about coordination, or is it about direct and control? And what if you have a bifurcation of those concepts? Right. So it's because of the complexity of how corporations organize themselves, it starts to get muddy. And then I think that what Hertz says is you look to who makes the real calls, who's the top person. No, Hertz says direct, control, and coordinate. That's what Hertz says. Okay, but I guess I took your question as, well, what if you have some evidence that there's direction and control from one place but coordination from another? Precisely. Okay, and my answer to that is? And then it may turn on who has the burden to establish the nerve center, right? Well, okay, I mean, I agree with that, yes, but then I would say that when you have that mixture like you're talking, the question is where are the real players? And here, 22 of 27 officers, all nine directors, the CEO, the CFO, the general counsel. I understand you're relying on your facts, but my point is you don't mean to suggest, I assume, that there will always be an answer proven before a federal trial judge. In other words, let me rephrase that. It may be true that every corporation has a nerve center and therefore a principal place of business under Section 1332. That almost certainly is true, I suppose. Yes. But that doesn't mean that either a plaintiff in an original action under 1332 or a defendant under the removal statute will always be able to establish that by preponderance of the evidence. Don't you agree with that? Right, I mean, so, right, yes, you're saying that every business has to have a principal place of business. No, I'm not saying it has to have. I'm saying every business probably has. Okay. But I'm further saying it doesn't mean that a litigant, even one as accomplished as you are, will be able to prove that. Correct, sure. Yes, there are plenty of cases. And a failure of proof means the one with the burden loses. Correct, absolutely. And I think we've met our burden here, and also I think that the evidence, you know, the reading of the deposition, we're under the clear error standard. And so certainly Mr. McLaughlin interprets a lot of that deposition. Is it really clear error, or are we dealing here with an issue of law? I thought the statutory question of whether there's diversity of jurisdiction, diversity of citizenship jurisdiction, is a pure question of statutory interpretation. But his factual findings about how he interprets a deposition and what the deposition means, what the affidavit means, all that stuff is under a very high standard. Interpretation of a deposition is a factual finding. Yes. And we can't read the deposition ourselves and draw the necessary answers. Well, it's a high standard. You have to find that his reading and interpretation of the evidence is not plausible, right? And that if you disagree with him, that's not enough. It's got to be more than that. It's got to be clear error. It's a sufficiency of the evidence question, isn't it? It's not a clear error question. It's whether the evidence is sufficient to establish by a preponderance of the evidence that your client's principal place of business under Hertz is in some place other than West Virginia. Right. The deposition, the list of the officers, the affidavit, has the burden been met? That's the question. Correct. Any other questions? One question I have for you as to the merits. Your company can just ignore OSHA notices as to hazards on the work? Well, Your Honor, it wasn't an OSHA notice. It was a NIOSH publication, which is a research publication. And, you know, it's my position. And NIOSH publishes these kinds of research papers on all kinds of different topics. All of which relate to work-related risk. Absolutely. And I'm sure your company would be very interested in them, aren't they? Sure. Absolutely. But we look out for publications that are in our industry. Well, you know these people were removing pigeon droppings all over the place every day, every work day, right? Well, I dispute that the facts show that. I mean, I don't think that they're – I mean, again, in the record, I mean, he testified as to two to three feet of bird droppings. I mean, I don't think that's credible. I mean, I think he certainly removed some bird droppings. He backed off of that two to three feet of bird droppings significantly. Sure, absolutely. I mean, you don't want to – But, I mean, I think the fact that he said that at the outset sort of goes to the credibility. But it was a significant amount of bird droppings. They were exposed to every work day. I'm not sure that the record supports that either. But even if it was – Does the record indicate 66 days during the one-year period that he cleaned these precipitators? I think that's what the record reflects. That he worked 66 days? On this precipitator. Correct, yes. He cleaned up 66 days out of a one-year period. Yes, where he claims that he was exposed to the bird droppings. And he was wearing a respirator the entire time. That's about three months of work spread over the year. Right. It's significant, don't you think? Well, he was wearing a respirator that protects him from asbestos, arsenic, lead paint. And so there's been no evidence that it wouldn't also protect him from aerosolized bird droppings. And also, there's nothing hazardous about bird droppings by themselves. You know, the disease he complains of, histoplasmosis, is caused by a fungus that grows in soil. And there's no evidence. But bird droppings make it conducive for growth. Absolutely. But you've got to some – I mean, this is a 500-foot – I mean, a 200-foot steel structure. You've got to somehow get the soil up onto the precipitator to mix in with the droppings. And there's no evidence that that ever happened. And you have no evidence of any prior complaints about it? Well, yeah, there was no complaints, no issues. The union never had an issue of complaints of this. And, again, I mean, you read the literature about the disease. I mean, it occurs in industries that contact soil a lot – excavation, factory farming, things of that nature. Not sort of like – I mean, this guy was a boilermaker. He was a welder. It doesn't – it's not a hazard that typically occurs in his type of work. So if he was cleaning out, like, an old barn, you know, something like that, or an abandoned building, you know, that's where they've had nests of birds, that type of circumstance. But, you know, out in the sun, high up off the ground, steel, not a place that you get this disease. I mean, that you get this fungus growth. Thank you. Thank you. Mr. McLaughlin, you have some time reserved. Real quickly, back to the jurisdictional issue. I do want to point out that the language in HRSA says it's the place where high-level officers direct, control, and coordinate. It doesn't refer to directors. Ultimately, the Board of Directors has the kind of control that I think is the only evidence that they've introduced is the kind of control that Columbus, Ohio exercises here, big-picture activities. The Board of Directors controls that. You need money beyond what is ordinarily in your budget. You need to borrow money. The Board of Directors controls that. When HERT said we're high-level officers, direct, control, and coordinate. And 22 of the 27 officers are in Columbus. But all of the officers who actually direct, control, and coordinate this company are stationed in Charleston. All of the officers who have specific APCO designations, the president and chief operating officer is in Charleston, the vice president for generating assets is in Charleston, the vice president for distributions operations are in Charleston. Those 22 officers are officers of every subsidiary that American Electric Power owns. And I know in Central West Virginia Energy said, well, we're not going to get into that. But at some level, you have to get into how much time are they actually spending, whether they're actually directing, controlling, and coordinating these actions. Could you observe process on the defendant here in Ohio? I guess the answer has to be yes, right? I could have sued in Ohio, although I don't know that I would have had jurisdiction over the co-defendant in Ohio. Okay. I mean, yeah, I could have found an officer. I could have found the CEO. I could have served. That would have been good service in West Virginia. I couldn't have found an employee of Appalachian Power in Ohio. So all of those things. Well, and an officer is an employee, right? Which is actually one of the things that really jumped out at me in that I think it was the deposition. Maybe it was the affidavit. But he actually says there are no, as you just said, there are no employees of APCO in Ohio. That's right. And I thought, well, wait a minute. Isn't the CEO an employee? As I understood the testimony, those 22 officers who work in Columbus. But an officer is an employee of the corporation? Most of them, their paychecks are cut by American Electric Power Service Corporation, by a corporation that provides services to the various AEP entities, exactly the kind of services that we're talking about that they're focusing on, engineering services, accounting services, and legal services. Did you argue to Judge Chambers that the evidence was in Equipose? No. Again, at the time, if you reverse the Central West Virginia Energy Corporation case, it just seemed like a slam dunk. So the lesson here is don't rely on district court opinion. There are other district court decisions that are being reviewed by the appellate courts. That's a good lesson. I'm going to move on to the notice issue, if I can, really quickly. A lot of the things that Mr. Mitchellmore said were not passed upon by the district court. There were motions relating to the elevation of the elevated surface and whether it could have gotten there and all that. That wasn't passed upon by the district court. It's not here. I will note that most of the places that we think of, and there was testimony to this effect, the only person who ever said histoplasmosis cannot get into an accumulation of elevated bird droppings is Mr. Mitchellmore. None of their experts ever said that. I'm not aware that anybody ever said that. The literature is replete with examples of pigeon droppings accumulating on roofs, falling off roofs, and getting into HVAC systems. So where in the record is there evidence that this fungus was on this precipitator? From the testimony of the expert witnesses who testified that were called by the plaintiffs. Dr. Duckettman? Dr. Duckettman is one. He just said, I'm not sure that Dr. Duckettman said that the fungus was actually there. He said that he is reasonably certain that Roger Hoosier contracted his fungus, this infection, from his time working and sweeping out those steel channels. He said we know for a fact that it gets into elevated surfaces. We know for a fact that large- Right, but do we know for a fact that it was in that elevated surface? We know for a probability, for a reasonable probability, which is what he said. Did you test it on the site? No. By the time that the mass wasn't discovered, and the actual literature, this is a fairly paired, a classical presentation of a lung mass. Following a large workplace exposure, the mass develops two to three years, detected on a routine chest X-ray. It's a common presentation that that kind of a mass develops following a large workplace exposure, not any of the kinds of ubiquitous exposures that you might get from gardening or- So the answer is no, you didn't test as to whether the fungus was at this workplace or not? I'm sorry, the unit was out of service by the time that we brought the lawsuit. By the time that Roger Hoosier was aware that, well, I don't know if the unit was out of service by the time that Roger Hoosier was aware of his mass and histoplasmosis, but by the time that we filed the lawsuit and we filed it timely, the unit was out of service. It had been cleaned, and I believe the record shows, and the testimony of Jeffrey Atkinson shows, that they had applied some repellents to the surfaces to keep the birds off of there. So there was nothing to test. Do you have a tough case? We may have a tough case, but it would be- the toughness of the case was- the way in which it's tough, I don't believe, and we'll concede that it's a case that requires some proof. I don't believe that any of the issues here, the issue that was actually passed upon by the district court was tough. I think that the OSHA publication clearly can- or the OSHA dissemination of a NIOSH publication, clearly a jury can decide that that provides notice. That's the only issue that was passed upon here, and I don't think that the case, tough as it is, belongs in federal court. But getting past that, you had other problems, too. Even if there was notice, what about the proximate cause? Because even if you had notice, it looks like you have done the same kind of protection they were doing without having to notice. It's not even evidence that was elevated or different. Oh, there is evidence about that. We just never got into it. The respirator that they should have worn, according to the NIOSH publication, was a full-face respirator to keep it out. With dust, the respirator that they wore was for basically vaporizing lead paint. It's a different hazard. It's less- there's a lower risk of it infiltrating a half-face respirator. That's what they did. And then that they would have cleaned it in the first instance. So there is evidence. It's not been germane to the appeal. But there is evidence from our industrial hygiene expert that the respiratory protection was not adequate for the histoplasmosis risk presented there. Thank you. Thank you so much. I'm going to ask the clerk to adjourn the court. Senator Dyer, then we're going to come down and recap.
judges: Roger L. Gregory, Andre M. Davis, Stephanie D. Thacker